# United States Court of Appeals
## For the First Circuit

No. 23-1165

NATALE COSENZA,
Plaintiff, Appellant,

v.

CITY OF WORCESTER, MA,
Defendant, Appellee,

KERRY HAZELHURST; JOHN DOHERTY; T.J. COAKLEY;
MARK RICHARDSON; ALLAN BURNES;
DANIEL BENEDICT; BRIAN DONOHUE; ROBERT TURGEON; AS YET
UNKNOWN WORCESTER POLICE OFFICERS; DAVID GRADY;
DARLENE ROCHEFORD,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Gelpí, Lynch, and Montecalvo,
Circuit Judges.

Steve Art, with whom Jon Loevy, Locke Bowman, Megan Pierce,
and Loevy & Loevy were on brief, for appellant.
Douglas T. Radigan, with whom Brian J. Edmonds, and Bowditch
& Dewey, LLP were on brief, for appellee.

October 28, 2024

**LYNCH, Circuit Judge.** Natale Cosenza was convicted in 2002 by a jury in Massachusetts state court of the assault and battery with a dangerous weapon of Melissa Horgan and the armed burglary of her apartment. A significant part of the prosecution's evidence against Cosenza was the victim's identification of Cosenza from a photo array administered by investigating Worcester police. In light of later developments in the law, the state courts, in 2016, granted him a new trial and, in 2017, suppressed the photo array evidence, leading the Commonwealth to enter a nolle prosequi.[1]

In this federal civil rights action brought in 2018, 16 years after his conviction, Cosenza sued the City of Worcester for monetary damages on the theory the City had adopted an affirmative policy of not properly training its officers as to photo arrays and other investigative techniques, and the City's deliberate indifference to his constitutional rights caused him injury. The federal district court entered summary judgment for the City. Cosenza v. City of Worcester, No. 18-cv-10936, 2021 WL 5138493, at *14 (D. Mass. Nov. 4, 2021). We affirm.

---

[1] Massachusetts law defines a "nolle prosequi" as "a strategic decision by the Commonwealth to cease pursuing charges. Its entry is thus an affirmative exercise of a prosecutorial tool to discontinue prosecution." Commonwealth v. Denehy, 2 N.E.3d 161, 172 (Mass. 2014). "A prosecuting attorney may enter a nolle prosequi of pending charges at any time prior to the pronouncement of a sentence . . . ." Mass. R. Crim. P. 16(a).

- 3 -

The undisputed record evidence shows Worcester did not exhibit deliberate indifference to Cosenza's constitutional rights. Among other things, Cosenza did not point to any evidence that the City maintained a policy of not training officers on the procedures to conduct photo arrays, officers in fact completed on-the-job training, and both state and federal law as to photo arrays did not then cast doubt on the procedures used. See, e.g., Walker v. Medeiros, 911 F.3d 629 (1st Cir. 2018); Commonwealth v. Silva-Santiago, 906 N.E.2d 299 (Mass. 2009), abrogation on other grounds recognized by Commonwealth v. Moore, 109 N.E.3d 484, 497 n.9 (Mass. 2018).

## I.

## A.

At roughly 4:00 A.M. on August 14, 2000, Melissa Horgan woke in her Worcester apartment to find a man standing beside her bed wearing underwear, a t-shirt, and a white covering on his head. The man began striking Horgan with a hard object and a struggle ensued, which ended when Horgan kicked the man and he fled. Horgan's assailant entered the fourth-floor apartment through a window in Horgan's roommate's bedroom, who was not at home that night.

Horgan called the Worcester Police. Officer Daniel Benedict and two other patrol officers arrived on the scene at 4:05 A.M. Officer Benedict spoke with Horgan and then with

- 4 -

Horgan's next-door neighbor, Robert Payton. Horgan told Officer Benedict that her assailant was a white male she did not recognize, wearing a t-shirt and underwear, and that her assailant either had no hair or that she did not know whether he had hair. Horgan did not provide Officer Benedict with an estimate of her assailant's height or weight. Payton told Officer Benedict that he had not seen or heard anything, but that he had "recently" seen Cosenza, who lived in a neighboring building, knocking on doors in Horgan and Payton's building and asking for money. Payton also told Officer Benedict that he believed Cosenza accessed the building by jumping onto a shared second-floor balcony. Officer Benedict memorialized his interviews in an incident report, in which he listed Cosenza as a suspect.

Detective Kerry Hazelhurst and his partner, Detective John Doherty, met with Horgan at her niece's residence on August 15, 2000 to conduct a photo array. Horgan's niece was also present. Based on Officer Benedict's incident report listing Cosenza as a suspect, Det. Hazelhurst prepared an array of nine identically sized photos for Horgan to view that included a photograph of Cosenza alongside photos of eight other men who had physical characteristics similar to Cosenza. Det. Hazelhurst laid out the photos on a table simultaneously, and Horgan then reviewed the array of all nine photos. Det. Hazelhurst followed his standard practice in administering photo arrays, which was to

instruct the witness to: "take their time, look at [the array] carefully, make sure you're certain who you pick out." His standard practice also involved telling witnesses "we need a positive identification for us to go further. If it's an iffy ID it's no good to us."

The detectives observed that Horgan had an intense emotional reaction when she reached Cosenza's photo in the array and identified him as her attacker. Det. Hazelhurst then told Horgan Cosenza's name and that he lived near her. Det. Hazelhurst did not take any notes during the interview or ask Horgan how confident she was in her identification.

Dets. Hazelhurst and Doherty, along with two other officers, T.J. Coakley and Mark Richardson, then began searching for Cosenza near Horgan's apartment building. Det. Doherty observed someone riding a bicycle, whom he identified as Cosenza. Det. Doherty testified at the criminal trial that, from a distance of roughly twenty feet, he yelled to the bicycle rider that he was a police officer and that he wanted to talk, but that the bicycle rider looked back and sped away.[2]

---

[2] During his deposition in this case, Officer Coakley, who grew up in the same neighborhood as Cosenza, testified that, during the search for Cosenza on August 15, 2000, the bicycle rider the officers encountered was 200 yards, not 20 feet, away, when Det. Doherty yelled, that Officer Coakley could not identify the person as Cosenza, and that it was not clear that the person heard Det. Doherty's command to stop.

Later that same day, Det. Hazelhurst took a statement from Horgan at the police station. In this statement, Horgan described her assailant as having "dark hair, medium to short length" and "dark eyes," which was similar to Cosenza's appearance in the photo that had been selected for the array. She estimated her assailant was "medium height, medium build."[3] Horgan also stated that her assailant was someone who had previously knocked on Horgan's door asking for money.

Horgan had left her apartment following the August 14 attack, and, on August 16, 2000, accompanied by Dets. Hazelhurst and Doherty, she returned to the apartment to pack a bag of clothes, which included some clothing that had been on her bedroom floor. On September 13, 2000, Horgan removed the clothes from the bag to wash them and found that she had packed a pair of men's shorts, which she did not recognize. Horgan called Det. Hazelhurst that day and told him about the shorts. Hazelhurst retrieved the shorts from Horgan. Det. Hazelhurst took a statement from Horgan about the shorts on February 20, 2001, in which Horgan stated that the shorts did not belong to any members of her family who might have been in the apartment. The shorts had semen stains on them, which were tested for DNA. The testing results obtained on July 17, 2001, excluded Cosenza as the source of the DNA.

---

[3] Later evidence showed Cosenza was approximately 5'3" tall and weighed around 125 pounds.

Det. Hazelhurst later testified at trial that he had searched for a pair of men's shorts or pants on August 16, 2000, when he accompanied Horgan to the apartment, but that he had not found any. Det. Hazelhurst did not memorialize any such search in a report, nor did he mention the search to Horgan when she alerted him to the shorts she found.[4]

**B.**

A Massachusetts grand jury indicted Cosenza on charges of assault with intent to rape in violation of Mass. Gen. Laws ch. 265, § 24, assault and battery by means of a dangerous weapon in violation of Mass. Gen. Laws ch. 265, § 15A, and armed burglary, in violation of Mass. Gen. Laws ch. 266, § 14.

Cosenza moved to suppress Horgan's photo array identification and sought to introduce expert testimony regarding the unreliability of eyewitness identifications. The motion judge found that "the defendant ha[d] failed to establish any impermissible suggestiveness" and that "there ha[d] been no violation of any state or federal due process provisions" and denied the motion to suppress. Hr'g Tr. at 1-93, Commonwealth v. Cosenza, No. 00-0430 (Mass. Super. Ct. Aug. 16, 2001). The judge

---

[4] During her deposition for this case, Horgan stated that, contrary to Det. Hazelhurst's trial testimony, she did not recall the officers searching her apartment for men's shorts or pants on August 16.

also denied Cosenza's request to introduce expert testimony.[5]

Trial Tr. at 21-23, Commonwealth v. Cosenza, No. 00-0430 (Mass. Super. Ct. June 24, 2002).

Cosenza's defense was that Horgan's identification was unreliable and that the shorts, and the DNA on them, belonged to the true attacker. The Commonwealth, in turn, argued that Horgan's identification was reliable and supported by the corroborating evidence of Cosenza's flight from police and that the shorts must have belonged to someone who stayed in the apartment after the attack, since Det. Hazelhurst testified that he had searched Horgan's apartment for shorts on August 16, 2000, but found none.

---

[5] The judge did not explain this ruling at the time, but the Massachusetts Appeals Court observed that he later elaborated on the reasoning behind his denial when adjudicating Cosenza's motion for a new trial. The Appeals Court quoted the trial judge as stating that:

> the circumstances surrounding the complaining witness'[s] encounter with the assailant were not particularly distinct from many identification-type cases. Commonwealth v. Ashley, 427 Mass. 620, 624 (1998)[,] citing Commonwealth v. Santoli, supra [] at 844. Nor was there evidence of post-event suggestion by investigating officers, a one-on-one showup, or a cross-racial component . . . . In conclusion, there were not sufficient grounds proffered by the defendant to suggest that the circumstances under which the complaining witness'[s] identification was achieved . . . required expert testimony to assist the jury . . . .

Commonwealth v. Cosenza, 844 N.E.2d 720, 2006 WL 871016, at *2 (Mass. App. Ct. 2006) (unpublished table decision) (alterations and omissions in original).

The jury found Cosenza guilty of assault and battery by means of a dangerous weapon and armed burglary. He received concurrent sentences of nine to ten years on the assault and battery conviction and twelve to twenty years on the armed burglary conviction.

Cosenza's conviction was affirmed in 2006 on appeal. See Cosenza, 2006 WL 871016, at *4. The Massachusetts Appeals Court rejected, among others, Cosenza's argument that he should have been allowed to present expert testimony regarding identification, finding that "the judge did not abuse his discretion in concluding that the jury would not be materially assisted by the proposed expert testimony." Id. at *2 (quoting Commonwealth v. Ashley, 694 N.E.2d 862, 866 (Mass. 1998)). Cosenza did not appeal the denial of his motion to suppress Horgan's identification. See id. at *1.

Cosenza petitioned for federal habeas relief in 2007 on the ground that the trial judge erred in excluding Cosenza's expert testimony related to eyewitness identification. Cosenza v. Marshall, 568 F. Supp. 2d 78, 80 (D. Mass. 2007). Cosenza did not argue that the identification procedures were themselves unconstitutional. See id. at 82. The district court denied Cosenza's petition, finding that the trial court did not abuse its discretion by excluding Cosenza's expert testimony and instead relying on a jury instruction to educate the jury about the factors

that could influence the reliability of an eyewitness identification. Id. at 84-85. The district court then denied Cosenza's motion for a certificate of appealability, finding that Cosenza failed to show "reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." Cosenza v. Marshall, No. 7-CV-10316, 2007 WL 4245897, at *1 (D. Mass. Nov. 29, 2007) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). Cosenza did not appeal from this denial.

In 2015, Cosenza moved for a new trial in Massachusetts Superior Court, based on developments since 2002 in Massachusetts law related to eyewitness identifications. The trial court granted Cosenza's motion in light of subsequently decided cases on the grounds that he had not been permitted to present expert testimony on the issue of identification at his first trial.

Cosenza filed a new motion to suppress Horgan's identification based on developments in the law in the years since 2002. At a hearing on his motion to suppress, Cosenza presented the expert testimony of Dr. Nancy Franklin. Dr. Franklin testified that Det. Hazelhurst had administered the photo array in a manner that reduced the reliability of Horgan's identification for the following reasons:

1) he failed to tell the witness that the suspect may or may not be present in the array;

2) he allowed another civilian to be present in the room with Horgan while she viewed the array;

3) his statement that "we need a positive identification to go further," among other statements, was highly suggestive;

4) confirmatory post-identification feedback can increase the witness's confidence in the identification; and

5) more than 30 hours elapsed between the crime and administration of the array.

A judge of the Superior Court granted Cosenza's motion, reasoning that Horgan had a limited opportunity to view her assailant and that the photo array and accompanying procedures were unduly suggestive under the standards established in Commonwealth v. Gomes, 22 N.E.3d 897 (Mass. 2015) (which differed from the standards established in Commonwealth v. Santoli, 680 N.E.2d 1116, 1118-19 (Mass. 1997), the prevailing standard in 2002) such that Horgan's identification as a whole violated Cosenza's right to due process under Article 12 of the Massachusetts Declaration of Rights. See id. at 911-16 (laying out five generally accepted principles regarding eyewitness identification to be included in a model jury instruction concerning eyewitness identification).

## C.

In 2018, Cosenza then brought this federal action pursuant to 42 U.S.C. § 1983 against Dets. Hazelhurst and Doherty

and the City of Worcester.[6]  As to the City of Worcester, Cosenza alleged that the City's lack of policies and failure to train its officers in matters related to photo array administration, evidence disclosure, and the fabrication of evidence made it liable for the detectives' alleged misconduct.  Cosenza alleged that Dets. Hazelhurst and Doherty violated Cosenza's U.S. constitutional right to due process, alleging that they: administered an unduly suggestive photo array and "fabricated" the contents of Horgan's post-identification statement by feeding her information about Cosenza; "fabricat[ed]" testimony that Cosenza fled from them on a bicycle; and "fabricat[ed]" testimony about searching Horgan's apartment for shorts on August 16, 2000.  Cosenza also alleged the detectives withheld or destroyed exculpatory evidence related to: Cosenza's flight, in that they did not disclose that the man on the bicycle was 200 yards away, not 20 feet; Horgan's statement, in that they failed to disclose the fact that they bolstered Horgan's identification; and the August 16 search of Horgan's apartment, in that they did not disclose that no search for shorts

_____

[6]  Cosenza also asserted claims against the non-detective officers who assisted in investigating Horgan's assault, but did not pursue those claims at summary judgment, and summary judgment was granted as to those defendants.  See Cosenza, 2021 WL 5138493, at *1 n.1.  Cosenza does not appeal that ruling.

or pants had been conducted. Cosenza also asserted claims for malicious prosecution and civil conspiracy.[7]

Cosenza deposed Lieutenant John Towns, who testified for the City of Worcester pursuant to Fed. R. Civ. P. 30(b)(6) and was hired by the Worcester Police Department in 1994. Lt. Towns testified that Worcester's police officers received training at the municipal police academy, where at least some trainers taught classes on photo arrays. At the time of Cosenza's arrest, the Worcester Police Department kept a written policy manual roughly 900 pages long.[8] Worcester had no written policies of its own specifically related to the administration of photo arrays. Worcester relied on "preferred practices." These preferred practices included: ensuring that witnesses viewed photo arrays alone, or at least separated from any other person relevant to the investigation; endeavoring not to make any suggestive statements prior to administering identification procedures; and selecting photographs of others for photo arrays that generally looked like the suspect. Relevant law was communicated to the Worcester Police

---

[7] Cosenza also alleged that the defendant officers were liable for failing to intervene to prevent the violations of Cosenza's constitutional rights. The district court found that, on the pleadings, the defendant officers were entitled to qualified immunity on this claim. See Cosenza v. City of Worcester, 355 F. Supp. 3d 81, 100-01 (D. Mass. 2019). Cosenza does not appeal this ruling.

[8] A copy of the manual, as it existed at the time of Cosenza's 2002 trial, could not be retrieved.

- 14 -

Department via "case updates" prepared by the Worcester District Attorney's Office. Lt. Towns could not recall a case update from the period in which Cosenza was arrested related to photo array identifications. As to the disclosure of exculpatory evidence, Lt. Towns testified that it was Worcester's preferred practice for officers to provide prosecutors with all of the information that the police had about a case.

Lt. Towns also testified that, as of 2002, Worcester did not have any preferred practices recommending that detectives: obtain a confidence statement from witnesses after administering a photo array; refrain from making statements following an array that tended to reinforce a witness's identification; pre- or re-interview witnesses before conducting a photo array; or only conduct photo arrays after obtaining a particular quantum of suspicion of the suspect's involvement.

The district court granted summary judgment to the City on all claims against it,[9] reasoning that Cosenza failed to

---

[9] The district court found that the detectives were entitled to qualified immunity on the claim that Horgan's identification was unduly suggestive, reasoning that "it was not clearly established at the time of the alleged violation that the identification procedure was unconstitutional." Cosenza, 2021 WL 5138493, at *1. The district court found that the detectives were also entitled to qualified immunity on the malicious prosecution claim, because it was "at least arguable" that the detectives had probable cause to arrest Cosenza. Id. at *13. The district court allowed Cosenza's claims that the detectives suppressed evidence, fabricated evidence, and engaged in a civil conspiracy to proceed to trial. Id. at *1.

- 15 -

demonstrate either "a pattern of unconstitutional violations" or that it was "so obvious" that failing to train detectives to conduct photo arrays would lead to a constitutional violation such that Worcester was deliberately indifferent to Cosenza's constitutional rights.  Cosenza, 2021 WL 5138493, at *8-9.

As to Cosenza's allegations that the City was liable for the officers' fabrication and suppression of evidence, the district court found that there was "no evidence that the City had an express policy that caused its officers to fabricate or suppress evidence; nor is there evidence that the City's failure to train its officers caused those alleged violations."[10]  Id. at *7 n.7.

The only matter before us is Cosenza's appeal as to the City of Worcester.

**II.**

We review a grant of summary judgment de novo.  Fagre v. Parks, 985 F.3d 16, 21 (1st Cir. 2021).  We construe the facts in the light most favorable to the nonmoving party -- here,

---

[10]  A jury returned a verdict for Cosenza on his claims that Det. Hazelhurst suppressed and fabricated evidence and that Dets. Hazelhurst and Doherty conspired to do so.  The jury returned a verdict for Det. Doherty on Cosenza's claim that he suppressed and fabricated evidence.

Dets. Hazelhurst and Doherty appealed the verdicts against them, and Cosenza cross-appealed the district court's grants of summary judgment.  Dets. Hazelhurst and Doherty then voluntarily dismissed their appeals, and Cosenza dismissed the detectives from his appeal.  Dets. Hazelhurst and Doherty assigned to Cosenza their claims against Worcester for indemnification of the verdict.

Cosenza -- and draw all reasonable inferences in his favor. Id. We are not bound by the district court's reasoning and may affirm on any ground supported by the record. Minturn v. Monrad, 64 F.4th 9, 14 (1st Cir. 2023).

A municipality may be liable under § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 563 U.S. 51, 60 (2011) (quoting Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978)). "Municipalities 'are responsible only for their own unconstitutional acts,' and 'are not vicariously liable . . . for the actions of their non-policymaking employees.'" Bannon v. Godin, 99 F.4th 63, 88 (1st Cir. 2024) (omission in original) (quoting Haley v. City of Bos., 657 F.3d 39, 51 (1st Cir. 2011)). Instead, a plaintiff "must prove that 'action pursuant to official municipal policy' caused their injury." Connick, 563 U.S. at 60 (quoting Monell, 436 U.S. at 691). Such policies "include[] the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Id.

"Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects

- 17 -

of those inadequacies." Haley, 657 F.3d at 52. "The deliberate indifference standard is 'stringent' and 'requir[es] proof that a municipal actor disregarded a known or obvious consequence of his action.'" Bannon, 99 F.4th at 88 (alteration in original) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997)).

Typically, "[a] pattern of similar constitutional violations by untrained employees" is necessary to demonstrate deliberate indifference. Connick, 563 U.S. at 62. It is clear there is no evidence of any such pattern, and Cosenza does not meaningfully pursue such a theory.

Instead, Cosenza attempts to fit within a different theory -- that a municipality may be liable after a single incident where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton v. Harris, 489 U.S. 378, 390 (1989).

We assume, without deciding, that Dets. Hazelhurst and Doherty committed the underlying constitutional violations for which Cosenza claims Worcester is responsible.[11] See Bannon, 99

---

[11] The underlying constitutional violations have been adjudicated both for and against Cosenza at various stages in this litigation, up to and including trial. The parties dispute whether we may consider jury verdicts rendered almost two years after the

F.4th at 88 ("[M]unicipal liability is viable only where a plaintiff establishes the existence of 'underlying, identifiable constitutional violations . . . .'" (quoting Lachance v. Town of Charlton, 990 F.3d 14, 31 (1st Cir. 2021))).

Cosenza's contention that Worcester maintained an affirmative policy not to train its officers to properly administer photo arrays is flatly contradicted by the record. Cosenza points to absolutely no evidence that Worcester maintained a written policy to that effect, that there was an informal practice of not training officers "so persistent and widespread as to practically have the force of law," Connick, 563 U.S. at 61, or even to any evidence that there was no training in photo arrays. On the contrary, the genuinely undisputed evidence of record demonstrates that Worcester police officers were trained at an academy under the umbrella of a statewide agency called the Municipal Police Training Committee, which offered at least some classes on how to conduct identification procedures.[12] Memoranda detailing changes

_____

summary judgment order Cosenza now appeals in adjudicating Cosenza's claims against the City. Because we can resolve Cosenza's appeal without deciding which of the violations Cosenza alleges are meritorious, we decline to do so.

[12] At oral argument the attorney for Worcester represented to the court that the Commonwealth of Massachusetts determines what is taught at police academies. Cosenza did not depose anyone authorized by the Commonwealth or the Municipal Police Training Committee to testify on their behalf about training materials or practices before 2002.

in the law were circulated to Worcester officers as necessary. On-the-job training occurred in the form of preferred practices, which included, at least for some officers, preferred practices on how to conduct photo arrays. Worcester's officers could also seek out supplemental training if they so wished.

Cosenza fails on another point. That judicial opinions established the U.S. Constitution required certain practices as of the time he was granted a new trial, thirteen years after his original trial, does not establish that those practices were required as of 2002. The Massachusetts Superior Court found that Horgan's identification was constitutionally permissible under the prevailing standards in 2002, the Massachusetts Appeals Court affirmed the Superior Court's denial of Cosenza's motion to present expert testimony on the unreliability of eyewitness identifications in 2006, and the Supreme Judicial Court declined to hear Cosenza's appeal. See Cosenza, 2006 WL 871016, at *1-2; Commonwealth v. Cosenza, 848 N.E.2d 1211, 1211 (Mass. 2006) (unpublished table decision) (denying discretionary review).

Through expert witnesses, Cosenza points to model national standards published by the International Association of Chiefs of Police in 1992 and to the U.S. Department of Justice's 1999 publication "Eyewitness Evidence: A Guide for Law Enforcement" as evidence that Worcester knew or should have known of the need for additional training on the administration of photo

- 20 -

arrays.[13] Cosenza argues that, in light of these contemporaneous publications, the possibility that untrained officers would violate the Constitution was so obvious that Worcester's failure to adopt the recommendations Cosenza relies upon amounts to deliberate indifference.

This argument is foreclosed by federal and state law. In Walker, a state prisoner sought habeas relief from his 2005 conviction on the grounds that his trial counsel was ineffective in failing to file a pre-trial motion to suppress a witness's identification of Walker in a photo array. 911 F.3d at 632. Like Cosenza, Walker contended that the identification procedure used was "constitutionally problematic because law enforcement did not inform [the witness] that the suspect's picture might not be included in the array, did not employ a 'double-blind' identification process, did not record [the witness'] selection

_____

[13] As related by Cosenza's expert, Dennis Waller, these publications recommended that officers conducting a photo identification: avoid "suggestive statements"; "preserve[]" the photo array; "[a]dvise witness[es] . . . [t]he suspect may or may not be among the photos presented"; "[a]ssure the witness that regardless of whether an ID is made, police will continue to investigate the incident"; and "review all documentation available and conduct an interview with the victim" before administering a photo array. Waller warns that failure to adhere to these recommendations "may [] cause misidentifications by suggestive words or conduct." Cosenza notes that there is evidence Det. Hazelhurst failed to comply with these best practices and that Worcester's formal and informal policies failed to instruct officers to comply with some or all of the practices.

from the array, and did not use a sequential-photographic array." Id. at 634.

We held that "Walker fail[ed] to identify any United States Supreme Court precedent that clearly establishes that, under the federal Constitution, the procedures he identified as being required must be employed." Id. at 635. Like Cosenza,[14] Walker relied on "a 1999 report on eye-witness evidence that the United States Department of Justice issued." Id. But that report "did not purport to hold that these procedures were required as a matter of federal constitutional law." Id. Rather, it set forth a variety of recommended practices aimed at improving the reliability of eyewitness identifications. But "showing merely that additional training would have been helpful" is not enough to establish municipal liability. Connick, 563 U.S. at 68.

The 1999 DOJ report (and other, similar reports and recommendations issued at that time and relied upon by Cosenza) cannot be said to have put Worcester on "actual or constructive notice that a particular omission in their training program [would] cause[] city employees to violate citizens' constitutional

_____

[14] Cosenza's reliance on Haley, 657 F.3d at 52, is misplaced. Unlike Cosenza, the plaintiff in Haley plausibly alleged, on a motion to dismiss, both that the Boston Police Department failed to train its employees in their evidence disclosure obligations and that the Boston Police had a policy of withholding evidence from criminal defendants. Id. at 52-53. Cosenza, at summary judgment, has identified no record evidence of a comparable policy from Worcester.

- 22 -

rights." Id. at 61. Many of the procedures Cosenza now argues were constitutionally required in 2002 were not required under the Massachusetts Constitution until 2009, see Silva-Santiago, 906 N.E.2d at 303, and the SJC did not adopt a position consistent with the 1999 DOJ report on which Cosenza relies until 2015, see Gomes, 22 N.E.3d at 912-16. The Massachusetts Constitution is more protective of due process in this regard than the United States Constitution, which to date incorporates fewer of the precautions advocated for by experts in the field of eyewitness identification than does the Massachusetts Constitution. See, e.g., United States v. Arthur, 764 F.3d 92, 102 (1st Cir. 2014) (noting that "emerging social science . . . gives pause to any knee-jerk assumption that eyewitness identification testimony . . . is necessarily reliable" but "does not mean . . . that such testimony must perforce be excluded"); United States v. Coleman, 851 F. App'x. 1016, 1021 (11th Cir. 2021) (lack of double-blind administration and failure to obtain confidence statement did not violate due process without "specific evidence of suggestiveness").

Cosenza also argues that Worcester is liable on similar theories for its officers' alleged fabrication and suppression of evidence. We agree with the district court that Cosenza has not identified any record evidence that Worcester "had an express policy that caused its officers to fabricate or suppress evidence"

or "fail[ed] to train its officers" in that regard.  See Cosenza, 2021 WL 5138493, at *7 n.7.  On the contrary, it is undisputed that it was the Worcester Police Department's preferred practice to disclose to the District Attorney's Office all known information about a case.  Even if the officers had failed to comply with that practice, that alone is not "sufficient to establish that they were trained inadequately."  Bannon, 99 F.4th at 103 (Montecalvo, J., concurring in part).

On this record, no reasonable factfinder could find deliberate indifference, making summary judgment for the City appropriate.

The entry of summary judgment for the City of Worcester is affirmed.